IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | CRIMINAL CASE NO. |
| | ) | 1:24-CR-218-SEG-LTW |
| JOHN DONOVAN WOODBURY | ) | |
| _____ | ) | |

## SENTENCING MEMORANDUM

COMES NOW the Defendant, JOHN DONOVAN WOODBURY, by and through undersigned counsel and hereby files this sentencing memorandum in support of a reasonable sentence of time served followed by a term of supervised release. In this memorandum, counsel will first address the unresolved sentencing guideline issues, and second, will show that a time served sentence is appropriate in light of the nature and circumstances of the offense, Mr. Woodbury's history and characteristics, and the other sentencing factors outlined in 18 U.S.C. § 3553. Although the requested sentence is below the advisory guideline range, it is reasonable and satisfies the goals of sentencing.

## BACKGROUND

This sentencing hearing poses the question of what is a fair sentence for a good person who, in a manic phase of a mental health incident, makes an online threat. As will be shown below, the answer is time served with specifically tailored conditions of supervise release that will ensure that Mr. Woodbury stays

on the right track. John Woodbury is 35 years old. He is college educated and has never committed a crime. He has a solid, professional work history and has maintained strong friendships and family relationships. He is pleasant and by all accounts is caring, compassionate, and empathetic. To understand how Mr. Woodbury finds himself before the Court for sentencing, it is helpful to look at his life history.

Mr. Woodbury grew up in Cobb County as a member of a relatively well off family. While his childhood did not involve privation, it was chaotic. His father was emotionally and physically abusive. During his childhood, Mr. Woodbury was bullied. It culminated in the 8th grade when he was beaten by a group of boys in a locker room. This caused his family to move him to a different school.

On top of the bullying at school and his abusive father at home, Mr. Woodbury childhood was further upended when his mother was diagnosed with an aggressive form of breast cancer when Mr. Woodbury was 11. With a poor prognosis for survival and a difficult treatment regime, Mr. Woodbury became a supportive caregiver for his mother.

Thankfully, his mother survived. However, the stress took a terrible toll on the marriage. Mr. Woodbury's mother began to drink and became an alcoholic. His parents eventually divorced after his father ran off with a mistress and cleaned

out the family bank accounts. Mr. Woodbury's mother's drinking got out of control and she went into rehab.

Despite all of this tumult during his formative years, Mr. Woodbury graduated from high school and went on to get a degree from the University of Georgia. However, the chaos took its toll. Mr. Woodbury started drinking when he was 12 and the alcohol became a crutch to numb the emotional pain. He was also experiencing what was later diagnosed as anxiety disorder, depression, bipolar disorder, and complex post-traumatic stress disorder.

After college, Mr. Woodbury worked as a paralegal at King and Spalding and in 2015 moved to California to go to law school. He attended Santa Clara University School of Law for one semester. However, he was still working full time at the law firm while trying to attend law school full time. Between these pressures and the constellation of mental health issues, Mr. Woodbury left school, quit his job and returned to the Atlanta area.

Eventually, Mr. Woodbury moved to the Washington, DC area and got a job selling computer software. However, he was isolated, drinking, and did not have his mental health under control. The combination of mental health and substance issues led him to attempt suicide in 2022. Thankfully, he was not successful and this incident was a wakeup call.

In response, Mr. Woodbury committed himself to mental health treatment. After the suicide attempt, Mr. Woodbury checked himself into an inpatient mental health treatment program. He then completed a follow-up mental health out-patient program. Since completing these programs, he has been regularly seeing a mental health provided for counseling and treatment.

In 2023, when Mr. Woodbury made the threat that forms the basis of this offense, Mr. Woodbury was under the care of a mental health professional. Unfortunately, the doctor made a serious medication error. To treat Mr. Woodbury's depression, the doctor prescribed him Cymbalta. As Dr. Julie Dorney explains in the attached psychiatric report, Cymbalta is effective for depression, but is absolutely the wrong drug for someone with bipolar disorder as it causes mania. (Attachment 1 – Report of Dr. Julie Dorney).[1] The threat that Mr. Woodbury sent was sent during a manic episode that was likely exacerbated, if not caused, by the Cymbalta.

In 2024, the doctor has prescribed Ability to Mr. Woodbury in addition to the Cymbalta. This is a much more appropriate medication for someone with bipolar disorder. While he still takes Cymbalta, the Abilify is so powerful that it

---

[1] This attachment is filed under seal.

tamps down the effects of the Cymbalta.[2] The result has been that Mr. Woodbury's bipolar disorder has been much better and he has not been experiencing the manic episodes.

Spending time with Mr. Woodbury now that he is correctly medicated, one sees a pleasant, calm, and rational person. He is nothing like what you would expect from someone who posted a threatening message online. In fact, he is just the opposite.

Letters from Mr. Woodbury's family and friends are striking in that they universally describe someone who is kind, gently, giving, and nurturing. (Attachment 2 – Letters of Support). In a letter to the Court, Mr. Woodbury's sister, Heather Woodbury, describes how she went through a difficult divorce that left her as a single parent to her eight year old son. She notes that Mr. Woodbury stepped in to be the father figure in her son's life. He went to games, picked him up at school, and just spent time with the child.

Similarly, his mother, Mary Anne Woodbury, writes that Mr. Woodbury has been caring for her since she has suffered a reoccurrence of her cancer. Mrs. Woodbury's letter also describes ways that Mr. Woodbury's kindness goes beyond his family. He was a supportive friend to others who were in the treatment center

---

[2] Dr. Dorney believes that Mr. Woodbury should not be taking Cymbalta. However, because he has been taking a large dose for a long time, it will take two years to properly taper him off this medication.

with him and helped his current cellmate, who did not have money for phone calls to family, with funds so the cellmate could speak to his children for the first time in six months.

His coworker, Jennifer Parker describes the support Mr. Woodbury gave her. In her letter, she wrote "John has often reminded me—during stressful times—that I am doing a great job as a mother. These words, offered without expectation, have lifted my spirits more times than I can count. His encouragement has meant a great deal to me, especially on the hardest days."

Desiring to focus his life on helping others, in 2024, Mr. Woodbury enrolled in the online masters in social work program at the University of Kentucky. Sadly, this conviction will dash that dream as the felony conviction will keep Mr. Woodbury from getting a social work license.

Mr. Woodbury is before the Court for sentencing because of a one off occurrence. In the midst of the manic phase of a bipolar episode, he went onto a message board and posted a threatening communication targeting the Director of the FBI. This is the only time Mr. Woodbury has posted a threat. He had no criminal history prior to his incident in June 2023. Similarly, since making the threat, Mr. Woodbury has not violated the law and maintained a spotless record while on pretrial release. This Court took Mr. Woodbury into custody on April

18, 2025, the day of his guilty plea. On the July 24, 2025 sentencing date, Mr. Woodbury will have spent three months in custody.

Mr. Woodbury entered a guilty plea to the second count in the indictment which charged him with threatening a federal law enforcement officer in violation of 18 U.S.C. §115(a)(1)(B). The presentence report (PSR) calculates Mr. Woodbury's total offense level as 17. The guideline is calculated using U.S.S.G. §2A1.6. The base offense level is 12 and there is a 2-level increase pursuant to §2A6.1(b)(5) for substantial risk of inciting others to violate 18 U.S.C. §115. The PSR also assigns a 6-level increase for official victim under U.S.S.G. § 3A1.2. This results in an adjusted offense level of 20. A 3-level reduction for acceptance of responsibility brings the total offense level down to 17. With no criminal history for Mr. Woodbury, this results in a guideline range of 24-30 months. In the plea agreement, the government has agreed to recommend a 1-level downward variance. This would result in a guideline range of 21-27 months.

Under the facts and circumstances presented in Mr. Woodbury's case, the suggested custody range currently listed in the PSR is unreasonable. For the reasons discussed below, Mr. Woodbury's guideline objection should be sustained. Ultimately, a downward departure and/or a downward variance to time served with a period of supervised release would result in a sentence that is

7

both reasonable and "sufficient, but not greater than necessary." 18 U.S.C. § 3553(a)

## ARGUMENT AND CITATION TO AUTHORITY

### I. Mr. Woodward Should Not Receive a 2-Level Increase Pursuant U.S.S.G. §2A6.1(b)(5).

Under U.S.S.G. §2A6.1(b)(5), a defendant receives a 2-level increase if he "(A) is convicted under 18 U.S.C. § 115, (B) made a public threatening communication, and (C) knew or should have known that the public threatening communication created a substantial risk of inciting others to violate 18 U.S.C. § 115." U.S.S.G. §2A6.1(b)(5). There is no dispute that Mr. Woodward was convicted under § 115 and that he made a public threatening communication. The issue raised in this objection is whether he knew or should have known that his public threatening communication created a substantial risk of inciting others to violate § 115.

In the context of interpreting the knowledge requirement for creating a substantial risk in the arson guideline, U.S.S.G. §2K1.4, the Eleventh Circuit adopted the Model Penal Code definition of knowledge. *United States v. Honeycutt*, 8 F.3d 785, 787 (11th Cir. 1993). Under *Honeycutt*, knowledge means that the defendant "is aware that it is practically certain that his conduct will cause such a result." Thus, for the enhancement to apply, Mr. Woodbury had to be aware that

8

it is practically certain that his posting of the threat created a substantial risk of inciting others to violate § 115.

The Government cannot prove that Mr. Woodbury had such a level of knowledge. First, it is estimated that there are over 900,000 posts each day on 4Chan. With that volume, it is unlikely that anyone would even see Mr. Woodbury's one random post in the sea of posts. Second, Mr. Woodbury is not a celebrity, an influencer, a leader of a group, or a famous person. He did not have a legion of followers who waited with excited anticipation for his every post. He was an anonymous nobody in the 4Chan world. Mr. Woodbury would have to have a remarkably and unrealistically elevated opinion of himself to believe that anyone out there would follow an imploring post from him -- some guy on 4Chan. Given his situation, he had no reason to believe that anyone would see his post, let alone act on it. Thus, he was not aware that it is practically certain that his post would create a substantial risk of inciting others to violate § 115. Furthermore, the risk has to be substantial. It cannot be just some risk.

In addition, the substantial risk is to cause others to violate §115. This statute has high knowledge and intent elements that are not met by others merely repeating threats that are not true threats or acting without the certain intent to commit acts against law enforcement officials because of their status. Again, this is a higher level of proof than the Government can produce.

9

## II. Downward Departure for Aberrant Behavior.

Mr. Woodbury and his case present the protype for an aberrant behavior downward departure under U.S.S.G. § 5K2.20. Under this policy statement, the Court may downwardly depart "if the defendant committed a single criminal occurrence or single criminal transaction that (1) was committed without significant planning; (2) was of limited duration; and (3) represents a marked deviation by the defendant from an otherwise law-abiding life." U.S.S.G, § 5K2.20(b).[3] The Tenth Circuit has explained that an offense does not have to be spontaneous, it merely must be "a short-lived, marked departure from an otherwise law-abiding life." *United States v. McClatchey*, 316 F.3d 1122, 1135 (10th Cir. 2003).

Mr. Woodbury satisfies these factors. There was little planning in this offense. Over the course of a few minutes, Mr. Woodbury wrote out a message and posted an online rant. It involved limited planning. To post to 4Chan, Mr. Woodbury did not even have to set up an account. The entire crime ended as quickly as it started with just a push of a button to post the message. That was Mr. Woodbury's crime in its entirety.

---

[3] Prohibitions of the application of this policy statement contained in § 5K2.20(a) and (c) do not have any impact or applicability to Mr. Woodbury's situation.

This offense is certainly a marked deviation from Mr. Woodbury's law-abiding life. He has no prior criminal history and no history of making threats. He is college educated with a solid work history. He maintains close friendships and has stepped up to be the father figure in the life of his young nephew. The letters attached to this memorandum describe to a kind, supportive, and caring person. The conduct was entirely out of character for Mr. Woodbury and took place during a manic episode when he was not receiving the correct medication for his bipolar disorder.

Application Note 3 to §5K2.20 explains that "[i]n determining whether the court should depart under this policy statement, the court may consider the defendant's (A) mental and emotional conditions; (B) employment record; (C) record of prior good works; (D) motivation for committing the offense; and (E) efforts to mitigate the effects of the offense." U.S.S.G. § 5K2.20 comment. (n.3). Each of these considerations support granting a downward departure.

Mr. Woodward's case is extraordinary in that occurred in just minutes with little planning, that it was brought on by a mental condition, and that the offense represents actions that are remarkably out of character for Mr. Woodward. This is aberrant behavior that qualifies for a downward departure under § 5K2.20.

### III. Mr. Woodbury Should Receive a Downward Variance to Time Served.

The ultimate command of 18 U.S.C. § 3553(a) is to impose a sentence that is "sufficient, but not greater than necessary, to comply with" the sentencing purposes stated in the statute. 18 U.S.C. § 3553(a). This parsimony provision requires district courts to impose the minimum punishment needed to satisfy the purposes of sentencing—just punishment, deterrence, protection of the public, and rehabilitation of the defendant. Thus, although § 3553(a) requires the sentencing court to consider the applicable guideline range, it is only one of several factors, and it is the parsimony provision that serves as "the guidepost for sentencing decisions post-*Booker.*" *United States v. Ferguson*, 456 F.3d 660, 667 (6th Cir. 2006).[4]

---

[4] Congress has set forth the factors a sentencing court must consider in determining a reasonable sentence, which include:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (3) the need for deterrence; (4) the need to protect the public; (5) the need to provide the defendant with needed educational or vocational training or medical care; (6) the kinds of sentences available; (7) the Sentencing Guidelines range; (8) pertinent policy statements of the Sentencing Commission; (9) the need to avoid unwanted sentencing disparities; and (10) the need to provide restitution to victims.

*United States v. Talley*, 431 F.3d 784, 786 (11th Cir. 2005) (summarizing 18 U.S.C. § 3553(a)).

The first factor that the court must consider is the nature and circumstances of the offense and the character and background of the offender. As explained above, prior to this offense, Mr. Woodbury went 35 years without any criminal conduct and his dabbling in criminality was short-lived and aberrant. While this is a serious crime, it is the direct result of a mental health incident that was exacerbated by a medication that should not have been prescribed to Mr. Woodbury. Mr. Woodbury was in the throes of a manic episode when he made the online threat. Mr. Woodbury is a kind compassionate person and this offense is completely out of character for him.

For the same reasons that a downward departure for aberrant behavior is appropriate, so too is a downward variance for aberrant behavior. If, for some reason, the Court decides that a downward departure on this ground is not authorized, it is correct and appropriate to consider aberrant behavior as a ground for a downward variance. *See United States v. DeRusse*, 859 F.3d 1232 (10th Cir. 2017). In *DeRusse*, the 10th Circuit held that a district court has broad discretion do downwardly vary under §3353 for aberrant behavior and the court is not constrained by any limitations for a downward departure contained in U.S.S.G. § 5K2.20. *DeRusse*, 859 F.3d at 1237.

The Court may also consider as a ground for a downward variance that Mr. Woodbury does not get a two-level reduction under U.S.S.G. § 4C1.1 because there

13

was a threat involved in the case. Despite making a threat, Mr. Woodbury is a non-violent offender with no criminal history. Given the circumstances surrounding his history and his conduct in this case, the denial of this reduction is arbitrary. Relatedly, if the Court overrules the objection relating to the significant risk of inciting others, then the offense level overrepresents the seriousness of the offense and the court should downwardly vary accordingly.

Sections 3553(a)(2)(B) and (C) directs the Court to consider the need for deterrence and the need to protect the public from further crimes of the defendant. It is a sad reality of our current culture that online threats are constant and everywhere. It seems that threats are now the normal way people express disapproval online and in public discourse. Of course, this does not make Mr. Woodbury's actions justifiable. Yet, since virtually no one gets arrested or prosecuted for making online threats, the mere fact of this prosecution has a deterrent effect. Prison certainly punishes and incapacitates people. It is not, however, the best deterrent. *See,* National Institute of Justice, *Five Things About Deterrence*, May 2016. ("increasing the severity of punishment does little to deter crime") (Attachment 3 – Five Things About Deterrence).

In *Five Things About Deterrence* an arm of the DOJ summarizes the scientific research on deterrence. It explains that "[r]esearch shows clearly that the chance of being caught is a vastly more effective deterrent than even draconian

14

punishment." *Id.* at 1. It also explains that "sending an individual convicted of a crime to prison isn't a very effective way to deter crime" in that it just makes offenders better criminals. *Id.* at 1. In this vein, the deterrent impact for the public comes from the fact that Mr. Woodbury was arrested and prosecuted, not from the length of the sentence.

An important consideration involves protecting the public from future violence or crimes by Mr. Woodbury. Prison is not the answer here. In fact, prison is probably detrimental. This case is a direct outgrowth of a mental health problem. The obvious way to prevent a recurrence or other issues is to treat the underlying mental health issues that Mr. Woodbury experiences.

Prisons are the worst places for mental health treatment and the Federal Bureau of Prisons is particularly bad. The BOP has a long history of understaffing in mental health positions and a poor record of providing mental health services. In fact, an Office of Inspector General report in 2017 spotlighted this problem. Office of the Inspector General, U.S. Department of Justice, *Review of the Federal Bureau of Prisons' Use of Restrictive Housing for Inmates with Mental Illness*, July 2017 available at https://oig.justice.gov/reports/review-federal-bureau-prisons-use-restrictive-housing-inmates-mental-illness. The report found that only 3 percent of inmates were being treated regularly for mental illness even though one BOP study found that 19 percent of inmates had a history of mental illness while

15

another BOP report found that 45 percent of inmates had symptoms or a recent history of mental illness. *Id*. at ii. Another stunning finding was that when the BOP implemented higher standard of care requirements, the number of inmates receiving mental health services dropped by 30 percent because staff was not available to treat inmates in accordance with the higher standards. *Id.* at. iii.; *See also* Christie Thompson and Taylor Elizabeth Eldridge, *Treatment Denied: The Mental Health Crisis in Federal Prisons*, The Marshall Project, November 21, 2018 (Attachment 4). Just last year, another Inspector General report found that "understaffing in Health Services and Psychological Services consistently led to insufficient care for mentally ill inmates." Eric Katz, *Understaffing and mismanagement contributed to hundreds of deaths in federal prisons*, Government Executive, February 16, 2024 available at https://www.govexec.com/oversight/2024/02/understaffing-and-mismanagement-contributed-hundreds-deaths-federal-prisons/394271.

If Mr. Woodbury goes to prison, even for a year or two, the appropriate treatment to keep him from experiencing a mental health crisis will be delay for that length of time. He is likely to come out worse off as his mental health needs will be callously disregarded for the period of his incarceration. The real way to protect the public is to sentence Mr. Woodbury to a term of supervised release

with specific conditions that address his mental health conditions and provide guardrails to avoid risk factors for future problems.

In considering protection of the public, it is important to recognize the aberrant nature of this conduct. Mr. Woodbury has no record of criminality or violence and, as shown by the letters of support, he is a genuinely nice guy. Importantly, Dr. Dorney conducted a detailed risk assessment of Mr. Woodbury and determined that he presents a low risk of future violence. (Dorney Report at 11). Moreover, the potential risk factors that exist with Mr. Woodbury can be easily addressed well readily available conditions of supervised release.

Dr. Dorney makes four recommendations for Mr. Woodbury's future success. First, his medication must be properly managed. This would include tapering him off of the Cymbalta. Second, Dr. Dorney recommends that Mr. Woodbury do dialectical behavioral therapy (DBT). This is the gold standard for treating the features of borderline personality that he exhibits and will provide him with skills to help him manage stress and irritability. Third, because of past issues with alcohol, random drug and alcohol testing and support groups would be helpful. Although Mr. Woodbury has been sober for three years, extra support can help him stay that way. Finally, employment and a stable environment will keep Mr. Woodbury focused and secure. These recommendations are all easily implemented as conditions of supervised release.

A sentence of time served with a structured term of supervised release is real punishment. Mr. Woodbury has seen the inside of a jail cell and the time on supervised release will be a significant restraint on his liberty. In describing the restraint of liberty involved with a sentence of probation, the Supreme Court explained:

> We recognize that custodial sentences are qualitatively more severe than probationary sentences of equivalent terms. Offenders on probation are nonetheless subject to several standard conditions that substantially restrict their liberty. *See United States v. Knights*, 534 U.S. 112, 119, 122 S.Ct. 587, 151 L.Ed.2d 497 (2001) ("Inherent in the very nature of probation is that probationers 'do not enjoy the absolute liberty to which every citizen is entitled'" (quoting *Griffin v. Wisconsin*, 483 U.S. 868, 874, 107 S.Ct. 3164, 97 L.Ed.2d 709 (1987); internal quotation marks omitted)). Probationers may not leave the judicial district, move, or change jobs without notifying, and in some cases receiving permission from, their probation officer or the court. They must report regularly to their probation officer, permit unannounced visits to their homes, refrain from associating with any person convicted of a felony, and refrain from excessive drinking. USSG § 5B1.3. Most probationers are also subject to individual "special conditions" imposed by the court.

*Gall v. United States*, 552 U.S. 38, 48, 128 S. Ct. 586, 595-96 (2007). The restrictions placed on a person on supervised release are similar. A time served sentence with supervised release would promote respect for the law and provide a just punishment for Mr. Woodbury. 18 U.S.C. § 3553(a)(2)(A).

## **CONCLUSION**

WHEREFORE, for all of the reasons set forth herein, Mr. Woodbury requests a reasonable sentence of time served to be followed by supervised release

Dated: This 17th day of July, 2025.

Respectfully Submitted,

*/s/ Brian Mendelsohn*
Brian Mendelsohn
Georgia Bar No. 502031
Attorney for John Donovan Woodbury

THE MENDELSOHN ERTEL LAW GROUP LLC
101 Marietta Street, N.W.
Suite 3325
Atlanta, Georgia 30303
404-885-8878
Fax: 470-826-1755
Brian@tmelg.com